UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

SARAH SMITH,

    Plaintiff,

v.                                                                                     4:06cv528-WS

LARRY CAMPBELL, in his official
capacity as the Sheriff of Leon County,
Florida, DAVID T. STEWART, M.D., in his
official capacity as District Medical Examiner,
LOUIS S. SARBECK, M.D., in his official
capacity as Associate Medical Examiner,
DEREK TERRY, individually, and CURTIS
PARKER, individually,

    Defendants.

_____

ORDER GRANTING CAMPBELL'S, TERRY'S, AND PARKER'S
MOTION FOR SUMMARY JUDGMENT

       The plaintiff, Sarah Smith ("Smith"), claims that she was coerced into confessing to the murder of her boyfriend, Timothy Robinson ("Robinson").  Smith was acquitted of all charges after the evidence presented at trial revealed that Robinson shot himself at point blank range.  Smith has sued Larry Campbell ("Campbell"), the Sheriff of Leon County, and two of his deputies, Derek Terry ("Terry") and Curtis Parker ("Parker"), seeking damages for false arrest and unlawful seizure, for violations of her substantive due process, and for intentional infliction of emotional distress.

       Before the court at this time are motions for summary judgment filed by Terry and Parker (doc. 60) and Campbell (doc. 61).  Smith has responded (doc. 70) in opposition

to the motions, and the parties have been advised (doc. 73) that the motions would be taken under advisement as of a date certain.

I.

Briefly, the evidence submitted in support of and in opposition to the motion for summary judgment reveals the following:

In the late evening hours of January 12, 2003, Smith called 911 to report a domestic disturbance involving Robinson and her son, Vincent Smith ("Vincent"). Robinson, who had been drinking with Smith throughout the evening, had broken the door to Vincent's bedroom, had thrown Smith across the kitchen floor when she tried to intercede, and had smashed the phone she had first attempted to use to call 911. After reaching the 911 operator with a second phone, Smith talked with the operator as Robinson (whose voice can be heard in the background on the 911 tape) pleaded with her to calm down.

Toward the end of her call, Smith suggested to the 911 operator that she probably did not need the assistance of law enforcement as Robinson appeared to be settling down. The 911 operator advised Smith that deputies would nonetheless be sent to her residence. Smith told the operator that she would meet the deputies at the gate.

After ending her 911 call, Smith went into the master bedroom where she found Robinson trying to take a handful of her Xanax pills. According to Smith, Robinson was "very depressed" about his life—he had been in a disabling automobile accident several years earlier—and about his mother's recent death. Smith grabbed the bottle from him

and—after being "slammed" backwards by Robinson—ran out of the bedroom, out the front door, and into the back yard where she hid the bottle of Xanax. When she re-entered the house, she saw Robinson lying on the floor in the bedroom, snoring and apparently passed out. After unsuccessfully attempting to get Robinson onto the bed, Smith proceeded to pick up various items that were on the floor around him, including a lockbox and a small gun. Smith put the gun in the lockbox and pushed the box under the bed where it was usually kept. Smith also instructed Vincent to hide a marijuana pipe and a small amount of marijuana in the woods behind the house. Smith then went outside to wait for the deputies to arrive.

When deputies from the Leon County Sheriff's Office ("LCSO") arrived, they found Robinson lying on the floor in the master bedroom. He was breathing but was otherwise unresponsive. Because there was a small amount of blood on the right side of Robinson's head, the deputies surmised that Robinson had fallen and struck his head. It wasn't until later, after Robinson was air-lifted to the hospital, that the deputies were informed that Robinson had a bullet in his head.

Once informed about the bullet wound, the deputies questioned Smith about a gun. Smith pointed the deputies to the lockbox under the bed. Finding the gun, the deputies examined the cylinder, finding one fired shell casing and one empty chamber. The cylinder was otherwise loaded. One of the deputies thereafter did a gunshot residue test on Smith's hands. Smith acted surprised, and began crying and yelling, when she learned that Robinson had a bullet wound in his head. She and Vincent were soon after taken in separate vehicles to the LCSO.

Arriving at the LCSO at or near 3:00 a.m., Smith was questioned over a period of six to eight hours by as many as six deputies, including Terry and Parker. Terry and Parker repeatedly assured Smith that the shooting was justifiable and that, as soon as she admitted to what had happened, they would take her to the hospital to see Robinson. Very upset and experiencing anxiety problems, Smith advised Terry and Parker that she had a panic disorder and needed her medications (she takes Buspar twice daily for anxiety and Xanax as needed for panic attacks and extreme anxiety). Terry and Parker denied Smith her medications. Smith repeatedly told Terry and Parker that she did not know what had happened to Robinson, that she did not hear a gunshot, and that she herself had not shot Robinson. Parker and Terry responded by yelling at Smith, swearing at her, and accusing her of lying. Parker, in particular, insisted that she could have shot Robinson without remembering it, that the shooting was in self-defense and therefore justifiable, and that she would not be allowed to see either her son or Robinson until she confessed.

At times during her interview with Terry and Parker, Smith was taken outside for cigarette breaks by Deputy Sheriff Kathi Kline ("Kline"). According to Kline, on one such break, Smith said; "I shot and killed my boyfriend." According to Smith, she made no such statement but, instead, said: "They say I shot and killed my boyfriend." Kline reported to Terry that Smith admitted to killing Robinson.

At approximately 10:00 a.m., after approximately seven hours of uncounseled questioning, without sleep, food, or medication, Smith finally told Terry and Parker what they wanted to hear, namely that she had shot Robinson. Based on her confession,

Smith was thereafter booked on charges of attempted murder and jailed.

Robinson died some time after he was taken to the hospital. Officers present during the ensuing autopsy told the medical examiner that Smith had confessed to shooting Robinson. Without testing for gunshot residue, the medical examiner concluded, and recorded on Robinson's death certificate, that Robinson's death was a homicide.

Formally charged with the murder of Robinson, Smith remained jailed for approximately 60 days before she received a bond hearing, and approximately one year and nine months elapsed before she was brought to trial. Not long before her trial, Smith received from the prosecutor evidentiary reports, photographic evidence, and gun shot residue test results, all of which revealed that Robinson had shot himself at point blank range. Among other things, photographs of Robinson on the night of his death revealed a dark substance on his right hand. Although gunshot residue ("GSR") samples were taken from Robinson at the time of the incident, the samples were not submitted to the Florida Department of Law Enforcement crime lab until more than ten months later. GSR was found in the samples taken from Robinson. In contrast, no gunshot residue was found on Smith's hands. Moreover, the physical evidence collected at the scene did not corroborate Smith's confession but was consistent with a death by suicide. Smith was acquitted of all charges by a jury on October 21, 2004.

II.

In Count VI of her amended complaint, Smith alleges that Campbell, Terry, and Parker violated her Fourteenth Amendment right to substantive due process by coercing

her to confess to a murder she did not commit.  To be sure, in the context of an involuntary confession, the Supreme Court has stated that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment."  Miller v. Fenton, 474 U.S. 104, 109, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985).  To constitute a violation of a suspect's right to substantive due process, "the specific conduct alleged [must] rise[] to a level of coercive interrogation that 'shocks the conscience.' "  Tinker v. Beasley, 429 F.3d 1324, 1327 (11th Cir. 2005) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)).  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Lewis, 523 U.S. at 849.  The conscience-shocking inquiry focuses on the objective unreasonableness of an officer's conduct.  Tinker, 429 F.3d at 1328.  It does not focus on the suspect's state of mind.  Id.[1]

In Chavez v. Martinez, 538 U.S. 760, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003), a plurality of four Justices explained (1) that the Fourteenth Amendment's substantive

---

[1] In her brief, Smith appears to conflate two separate inquiries: (1) whether a suspect's will was overborne, making his or her confession involuntary; and (2) whether an interrogating officer's conduct was objectively unreasonable.  The first inquiry, to which Smith devotes more than six pages of her brief, is relevant to a decision—in the criminal procedure context—about whether to admit a suspect's confession in a criminal trial.  The second inquiry is relevant to a decision—in a substantive due process context—about whether an officer is liable for damages in a civil lawsuit.  In this case, it is the second inquiry that is relevant.

Case No. 4:06cv528-WS

due process clause protects against "police torture or other abuse that results in a confession," 538 U.S. at 773; (2) that "[c]onvictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause;" id. at 774 (quoting Rochin v. California, 342 U.S. 165, 172, 174, 72 S. Ct. 205, 96 L. Ed. 183 (1952)); and (3) that "deprivations of liberty caused by 'the most egregious official conduct' . . . may violate the Due Process Clause." Id. (quoting Lewis, 523 U.S. at 846). Justice Kennedy, concurring in part and dissenting in part, wrote (1) that "[a] constitutional right is traduced the moment torture or its close equivalents are brought to bear," id. at 789, and (2) that "[t]he Constitution does not countenance the official imposition of severe pain or pressure for purposes of interrogation." Id. at 796. Justice Stevens, also concurring in part and dissenting in part, concluded that a substantive due process violation occurs when an officer engages in "the functional equivalent of an attempt to obtain an involuntary confession from a prisoner by tortuous methods." Id. at 783-84. The Court thus stressed that a substantive due process violation may occur when an interrogating officer extracts a confession by using egregious or brutal methods. See also, Lewis, 523 U.S. at 848 (noting that "the constitutional concept of conscience-shocking . . . points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability"); Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 623 (1st Cir. 2000) (suggesting that "conscience shocking" behavior must be either physically intrusive or violent or "strike at the basic fabric" of a protected relationship).

In Tinker, the plaintiff was arrested, incarcerated, and questioned about a murder

she did not commit. Twenty-four and the mother of three young children, Tinker had been identified as the person who shot and killed a bank teller during the course of a robbery. Based on that identification, officers conducted in-custody interviews of Tinker repeatedly over the course of several days, "telling her that her lawyer had 'bailed out' on her, that they were all she had to get her out of trouble, that she would never see her children again unless she confessed, and that she had two options: the electric chair or life in prison." Tinker, 429 F.3d at 1326. The officers referred to her "sizzling" and "frying" in the electric chair; they "pressured her through references to her recently deceased mother;" and they told her that if her father or any other family member went to a lawyer on her behalf "they would fuck it up for [her]." Id. She was released from custody late on the evening of the fourth day of her incarceration after the actual perpetrator of the crime was captured. While finding the officers' conduct "untoward and upsetting," the Tinker court found no conscience-shocking behavior and, accordingly, no violation of Tinker's substantive due process rights.

    Here, Terry and Parker interrogated Smith after learning that Robinson had a bullet in his head. It appeared that only Robinson, Smith, and Smith's son were in the house at the time of the shooting. The only gun found on the premises was located in a lockbox under the bed. While Terry's and Parker's suspicions later proved to be erroneous, their skepticism about Smith's claim of innocence was not unreasonable. To be sure, they questioned Smith for six or seven hours, albeit with breaks; they denied her requests for medication; they yelled at her; and they told she could not see her son or Robinson until she confessed to the crime. While their actions may have been

"untoward and upsetting," Terry and Parker did not engage in conduct that shocks the conscience. Smith's arguments to the contrary are unpersuasive. Terry and Parker are, accordingly, entitled to summary judgment as to Count VI of Smith's amended complaint.

Smith seeks to hold Sheriff Campbell, who did not participate in the questioning of Smith, responsible for the actions of Terry and Parker by alleging that Campbell "intentionally furthered Terry's and Parker's ability to abuse Plaintiff . . . by failing to adequately train, supervise or discipline Defendants Terry and Parker to prevent such harm." Am. Compl. at ¶ 63. Having found that Terry and Parker did not violate Smith's substantive due process rights, the court finds no merit to Smith's claim that Sheriff Campbell should be held responsible for a violation of her substantive due process rights. Like Terry and Parker, Campbell is entitled to summary judgment as to Count VI of Smith's amended complaint.

III.

In Counts IX and X of her amended complaint, Smith alleges that Terry and Parker first seized and then arrested her without probable cause in violation of the Fourth Amendment. She further alleges that Sheriff Campbell "furthered Terry's and Parker's ability to abuse Plaintiff . . . by failing to adequately train, supervise or discipline Defendants Terry and Parker to prevent such harm." Am. Compl. at ¶¶ 86 & 99. She seeks damages under section 1983 for unlawful seizure (Count IX) and false arrest (Count X). The court finds no merit to these claims. When Terry and Parker took Smith to the LCSO for questioning, they knew that Robinson and

Smith had been involved in a domestic disturbance, that Robinson had been shot in the head during the course of that disturbance, and that a gun—with one empty chamber and one fired shell casing—had been found at the scene in a lockbox under the bed. Those facts alone were sufficient to establish probable cause to believe that Smith was guilty of shooting Robinson.[2]  Because probable cause[3] to seize and/or arrest a suspect defeats a section 1983 claim based upon unlawful seizure and/or false arrest, Lorenzo v. City of Tampa, No. 07-13420, 2007 WL 4374288, at *3 (11th Cir. Dec. 17, 2007), Terry and Parker are entitled to summary judgment as to Counts IX and X.[4]  Similarly, because there was probable cause to seize and arrest Smith based on the circumstances known to the officers at the scene, Sheriff Campbell—who was not at the scene and did not participate in the decision to seize Smith—is also entitled to summary judgment as to Counts IX and X.

---

[2] While the evidence ultimately established that Robinson shot himself, it was not unreasonable for the deputies on the scene to dismiss the notion that Robinson had shot himself, then placed the gun in the lockbox and pushed the lockbox under the bed.

[3] Probable cause exists "when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (per curiam) (quoting United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992)).  "This probable cause standard is practical and non-technical, applied in a specific factual context and evaluated using the totality of the circumstances." Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007).

[4] Even *if* the circumstances at the scene did not provide probable cause to seize and/or arrest Smith, those circumstances provided Terry and Parker with "arguable cause" to believe that Smith shot Robinson.  Having "arguable cause" to believe that Smith was guilty of shooting Robinson, Terry and Parker are—at the very least—entitled to qualified immunity as to Counts IX and X.  Indeed, reasonable officers in their position at the time would not have known that it would be unlawful to take Smith to the LCSO on suspicion of attempted murder.

Case No. 4:06cv528-WS

### IV.

The court having determined that Campbell, Terry, and Parker are entitled to summary judgment on all of Smith's federal claims (Counts VI, IX, and X), the court declines to exercise supplemental jurisdiction over Smith's state law claims.

Accordingly, it is ORDERED:

1. Sheriff Campbell's motion for summary judgment (doc. 61) is GRANTED, and summary judgment shall be entered in Campbell's favor as to Counts VI, IX, and X of Smith's amended complaint.

2. Terry's and Parker's motion for summary judgment (doc. 60) is GRANTED, and summary judgment shall be entered in Terry's and Parker's favor as to Counts VI, IX, and X of Smith's amended complaint.

3. Consistent with the court's earlier order (doc. 33), Count IV (against Louis Sarbeck), Count V (against David Stewart), and Count XI (against Louis Sarbeck) are DISMISSED with prejudice.

4. All other counts are DISMISSED without prejudice.

5. The clerk shall enter judgment accordingly.

DONE AND ORDERED this ___13th___ day of ___February___, 2008.


s/ William Stafford  
WILLIAM STAFFORD  
SENIOR UNITED STATES DISTRICT JUDGE